# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

MARCUS M.,[1]

                    Plaintiff,

v.                                                      ACTION NO. 2:23cv159

MARTIN O'MALLEY,[2]
Commissioner of Social Security,

                    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Marcus M. filed this action for review of a decision by the Commissioner

("Commissioner") of the Social Security Administration denying his claim for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits under Titles II

and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 13. The Court

recommends that plaintiff's motion for summary judgment (ECF No. 15) be **DENIED,** and the

decision of the Commissioner be **AFFIRMED.**

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

[2] Martin O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See* 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

## I.   PROCEDURAL BACKGROUND

Marcus M. ("plaintiff") protectively filed applications for SSDI and SSI benefits in 2018, alleging disability beginning on January 1, 2016, because of emphysema, asthma, and chronic obstructive pulmonary disease ("COPD"). R. 286–311, 371.[3] Following the state agency's denial of his claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 87–132, 163–64.

ALJ Jeffrey Jordan held an in-person hearing attended by plaintiff and his counsel, Charlene Morring, on August 4, 2022,[4] and issued a decision denying both SSDI and SSI benefits on August 16, 2022. R. 17–32, 39–72. On February 21, 2023, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on April 18, 2023. ECF No. 1. In response to the Court's order, plaintiff moved for summary judgment on July 24, 2023, and the Commissioner filed a brief in support of the decision denying benefits on August 22, 2023. ECF Nos. 15–18. As oral argument is unnecessary, this matter is ready for a decision.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   *Background Information and Hearing Testimony by Plaintiff*

During the hearing before the ALJ on August 4, 2022, plaintiff provided the following

---

[3] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[4] On January 15, 2021, ALJ Monica Flynn continued plaintiff's hearing so that he could obtain counsel. R. 73–84. On April 20, 2021, ALJ Flynn granted plaintiff's request for a continuance so that his attorney could be prepared and represent him at the hearing. R. 65–72.

information. At that time, the 45-year-old plaintiff lived alone in a one-story home. R. 44, 286. Plaintiff completed the eleventh grade, obtained a GED, and previously worked as a welder/metal fabricator, tree trimmer, and part-time as a construction worker. R. 45–48.

Plaintiff testified that he was no longer able to work due to his COPD, emphysema, and asthma. R. 49. Plaintiff explained that these conditions made it difficult to breathe in any conditions, but very difficult when around dust, fumes, and hot temperatures, or when walking, climbing, lifting heavy weights, or wearing a mask. R. 49, 53. To treat these conditions, plaintiff took Spiriva and Sybicort, and used inhalers and breathing treatments. R. 49. Plaintiff also testified that he suffered from osteoarthritis in his knees and elbows. R. 50. On one occasion, this caused his knee to swell to the "size of a volleyball." *Id.* He used a cane anytime he left the house and needed to take more than four or five steps, although it was not prescribed by a doctor. R. 50–51. The only relief he received for the knee pain was when fluid was drawn from the knee or when he was given steroid injections. R. 51. He may eventually need a knee replacement. *Id.*

Plaintiff also testified that he had an accident on a motor scooter, which ruptured his spleen, broke some ribs, and caused his lung to collapse. *Id.* His spleen was removed resulting in a compromised immune system. *Id.* Plaintiff was prescribed strong pain medications and, after his release from the hospital, he began methadone treatment to avoid addiction to pain medications. R. 53. Plaintiff testified that the methadone helped control his knee pain and the chest pain he experienced due to emphysema, and did not cause any side effects. *Id.* When asked by counsel if he experienced any neck or back pain as a result of the accident, plaintiff testified that he had a compressed vertebrae that affected his neck and back but that he had not "really seen anybody for that particular issue." R. 52.

3

When asked if any other conditions affect his ability to work, plaintiff reiterated that his difficulty breathing and pain in his knees kept him from being able to perform his past work. *Id.* He testified that he could perform the basic tasks needed to live on his own, like dressing and making simple meals. R. 54. He needed assistance with mowing the lawn or anything that required more rigorous exercise. *Id.*

Plaintiff completed a function report on August 26, 2019. R. 384–91. At that time, he was living with his grandmother, who he helped by running errands, preparing her meals, doing housework (dishes, cleaning, sweeping, vacuuming), doing yard work (mowing weekly), and sometimes assisting her with getting around. R. 384–86. Plaintiff explained that, in a typical day, he would make coffee, take his medications, have breakfast, watch the news, run errands, do housework and yardwork, have lunch, finish errands, fix dinner, watch television, bathe, and get ready for bed. R. 384. He did not have a driver's license, but went outside daily. R. 387; *see* R. 397 (indicating plaintiff's license was suspended). He shopped once a week for groceries and once a month for clothes, each for about one hour. R. 387. He enjoyed reading, watching television, using social media, and using gaming apps, and did these things daily. R. 388. He also talked with his girlfriend daily, attended group therapy for depression and substance abuse weekly, and went to the grocery store or drugstore with his grandmother once a week. *Id.* Plaintiff explained that he could only do light activities for up to an hour and could not perform "heavy activities," checking that his impairments affected his ability to lift, squat, bend, stand, reach, walk, kneel, stair climb, complete tasks, and use his hands. R. 389. Plaintiff clarified that he could pay attention "most of the time," follow written instructions well, follow spoken instructions and get along with authority figures fairly well, handle changes in routine to a fair extent, and handle stress depending on the amount. R. 389–90. Plaintiff stated that his asthma and emphysema limited his breathing

4

making it difficult to perform his previous work in construction or welding. R. 391.

Plaintiff's mother completed a third-party function report on September 18, 2019, providing information much like that provided by plaintiff. R. 393–403. She added that, due to his difficulty breathing and inability to continue his previous employment, plaintiff became anxious and suffered bouts of depression for which he was taking medication and attending group therapy. R. 403.

**B.**   ***Hearing Testimony by Vocational Expert***

Julie Stratton, a vocational expert ("VE"), also testified at the hearing. R. 54–61. The ALJ presented VE Stratton with a hypothetical premised on a person of plaintiff's age, education, and work history, who was capable of light work with these limitations:  (a) must avoid crawling, kneeling, and climbing ladders, ropes, and scaffolds, but can perform other types of movements occasionally; (b) can frequently finger, grasp, handle, and reach; (c) cannot perform fast pace work such as on an assembly line or work involving production quotas; (d) must avoid hazards such as dangerous machinery, unprotected heights, and vibrations; and (e) must avoid even moderate exposure to respiratory irritants, extreme temperatures, and humidity. R. 55.

VE Stratton testified that the hypothetical person could not perform plaintiff's past relevant work. R. 55–56. Such a person could perform work as a cashier, sales attendant, surveillance system monitor, document preparer, and parimutuel ticket checker. R. 56. VE Stratton testified that, if the individual would need to use a cane, needed a sit/stand option that allowed changing position every 30 minutes, and was limited to simple, routine, and repetitive tasks, he could perform the sedentary work of surveillance system monitor, document preparer, and parimutuel ticket checker. R. 56–59.

The ALJ inquired if VE Stratton's testimony was consistent with the Dictionary of Occupational Titles ("DOT").[5] R. 56–57. VE Stratton responded that her testimony about use of a cane and the sit/stand option were based on her vocational experience. R. 57.

In response to questions from plaintiff's counsel, ALJ Stratton testified that no work would be available to a person who was off task more than 10% of the workday. R. 58. In addition, VE Stratton testified that an employee may be exposed to respiratory irritants, such as perfumes and cleaning supplies, when working for any employer. *Id.*

## C.   *Relevant Medical Record*

### 1.   *Lawrenceville Primary Care PC*

On September 20, 2017, Christopher Ackerman, M.D., examined plaintiff, who had an expiratory wheeze that cleared with a cough, but otherwise clear and equal lungs. R. 474. Dr. Ackerman assessed COPD, chronic depression, and anxiety. *Id.* Plaintiff reported that he had an inhaler, would try to decrease his smoking, and that his depression was improving. R. 473–74.

Plaintiff next saw Dr. Ackerman in July 2018 for an exacerbation of his COPD. R. 472–73. Plaintiff reported smoking less and that his depression was improving. R. 472. Dr. Ackerman noted that plaintiff's diffuse wheezing improved with nebulizer treatment, and prescribed a nebulizer, albuterol, prednisone, and an antibiotic. R. 473.

---

[5] The *Dictionary of Occupational Titles,* and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles,* are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. *U.S. Dep't of Labor, Dictionary of Occupational Titles* (4th ed. 1991); *U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

### 2.    *Town Center Physicians*

In February 2020, plaintiff had a checkup with Denise Parsons, M.D., who diagnosed COPD and prescribed tiotropium and an albuterol inhaler.  R. 992.  He followed up with Nellie Chamblee, FNP, in May 2020 to have his medications refilled.  R. 743–44.  Except for a nervous mood, plaintiff's examination was normal, including no chest pain, chest congestion, or shortness of breath, and with normal strength and gait.  R. 743.  FNP Chamblee diagnosed COPD, depression, and a history of alcohol abuse, and refilled plaintiff's medications.  R. 744.

In August 2020, plaintiff's right knee was tender and swollen with a limited range of motion, but a McMurray's test (a series of knee and leg movements used to diagnose a torn meniscus) was negative.  R. 741.  The rest of plaintiff's examination was normal with no shortness of breath, wheezing, rhonchi, or rales, and with normal strength and gait.  *Id.*  FNP Chamblee prescribed a Medrol dose pack and naproxen.  *Id.*  The right knee pain and COPD continued on September 2, 2020.  R. 737.  Plaintiff reported that pain had also started in his left elbow, which had no swelling, redness, or warmth.  *Id.*  FNP Chamblee ordered labs to rule out arthritis and gout, and continued plaintiff's medications.  R. 738.  On September 22, 2020, plaintiff reported that the pain in his knees and joints was better, but he continued to have a limited range of motion and swelling in his right knee with no tenderness, redness, or warmth.  R. 735.  The rest of plaintiff's examination was normal and there was no mention of elbow pain.  *Id.*  In October 2020, FNP Chamblee referred plaintiff to an orthopedist for his knee pain after treatment with steroids and non-steroidal anti-inflammatory drugs for one month provided only minimal relief.  R. 984.

Plaintiff returned for a medication refill in January 2021.  R. 733.  Plaintiff reported to FNP Chamblee that his knee pain was much better after treatment with the orthopedist, that he was eating and sleeping well, that he was not drinking, and was smoking ½ pack of cigarettes per day.

*Id*; *see* R. 850–51 (noting plaintiff's report of smoking ½ pack of cigarettes per day from November 2020 through July 2021). Except for an elevated blood pressure, his examination was normal. R. 733–34. Plaintiff requested, and was given, a referral to a pulmonologist as he needed to be "seen by a specialist due to disability rules." R. 733–34.

### 3.     *Lakeview Pulmonology*

On February 1, 2021, Habib Barakat, M.D., with Lakeview Pulmonology, examined plaintiff on referral from FNP Chamblee. R. 981–82. Dr. Barakat noted that plaintiff had asthma as a child and had been smoking 1 pack of cigarettes a day for 28 years. R. 981. On examination, plaintiff had decreased breath sounds and his spirometry test[6] results were $FEV_1$ 2.31 (70.8%) and FVC 3.52 (86.1%). R. 981–82. Dr. Barakat assessed "mild COPD with $FEV_1$ 70% predicted nowhere near disability." R. 981.

### 4.     *Virginia Ortho & Spine Specialists*

Daniel T. Huttman, M.D., treated plaintiff for right knee pain in November 2020 on referral from FNP Chamblee. R. 1005. Lab testing ruled out gout and rheumatoid arthritis, and x-rays showed no sign of arthritic change. *Id.* Although plaintiff's knee was positive for effusion and crepitus, his examination was otherwise normal, including full range of motion and full strength. R. 1007–08. Plaintiff rated his pain as 5 out of 10. R. 1005. Dr. Huttman treated plaintiff with aspiration and injection, and plaintiff reported pain at 0 out of 10 post-procedure. R. 1008–09.

Plaintiff returned in March 2021 with right knee swelling and tenderness, rating his pain as 7 out of 10. R. 1000. Plaintiff's range of motion was reduced, but he retained full strength. R.

---

[6] A spirometry test is a kind of pulmonary function test that measures how well you move air into and out of your lungs, and consists of measuring three forced expiratory maneuvers. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 3.00(E), 3.02 (A), (B). The volume of air exhaled in the first second of the forced expiratory maneuver is the $FEV_1$ and the total volume of air exhaled during the entire forced expiratory maneuver is the FVC. *Id.*

1002. Dr. Huttman ordered an MRI. R. 1003. In April 2021, plaintiff reported less swelling and occasional pain. R. 995. He had a full range of motion and full strength. R. 997. Dr. Huttman reviewed the MRI results that did not show any meniscal pathology or ligamentous pathology and no sign of osteoarthritis. R. 955–56, 995–98. Dr. Huttman offered aspiration and injection, but plaintiff declined. R. 998.

In June 2021, plaintiff returned and was treated by Manish Patel, M.D. R. 936. Plaintiff's right knee had decreased range of motion, some crepitation, moderate swelling, and some quadricep weakness, though he continued to have a normal gait. R. 940. Dr. Patel treated plaintiff with aspiration and injection. *Id.* In July 2021, Dr. Patel examined plaintiff's right knee which had a full range of motion, no crepitation, tenderness or weakness, and a negative Lachman's (used to diagnose an anterior cruciate ligament (ACL) injury) and McMurray's test. R. 933. Dr. Patel released plaintiff to activities as tolerated with no restrictions. *Id.*

### 5. *Bon Secours*

On August 6, 2021, plaintiff was riding his motor scooter while intoxicated when he hit a rock, and the motor scooter flipped landing partially on top of him. R. 908, 915. Plaintiff fractured three ribs, ruptured his spleen, and required an emergency splenectomy. R. 901–02, 915, 919–20. A CT of plaintiff's head showed no acute intracranial abnormalities, and a CT of his cervical spine showed no acute fractures or listhesis, but some spondylosis. R. 833–38. Upon discharge from the hospital on August 23, 2021, plaintiff had a normal examination with no chest pain or cough, no depression or anxiety (with a normal depression screening), normal gait, and full range of motion. R. 902–03.

Plaintiff's annual physical examination in November 2021 was normal, with Thomas Guirkin, M.D., noting that plaintiff was calm, had a negative depression screening, a full range of

motion, a normal gait, and was going to the methadone clinic. R. 887–88. Plaintiff reported "he is finally putting his life back together." R. 887. Dr. Guirkin refilled plaintiff's albuterol, continued his methadone maintenance, and started plaintiff on Symbicort for COPD and Chantix for tobacco cessation, noting that plaintiff smoked 1 pack of cigarettes per day. R. 886–87; *see* R. 850 (noting plaintiff reported smoking 1 pack of cigarettes per day from August 2021 through January 2022).

Plaintiff had two telehealth appointments with Dr. Guirkin in December 2021. R. 876–77, 880–81. His depression screening was negative, and he reported only smoking 12 cigarettes per day. *Id.* Due to elevated cholesterol, Dr. Guirkin prescribed Crestor. *Id.*

In January 2022, Dr. Guirkin treated plaintiff for tinnitus and referred him to an ear, nose, and throat specialist. R. 870, 872–73. Plaintiff reported that he had been to a pulmonologist several years ago, but never went back, and Dr. Guirkin referred plaintiff to the pulmonologist for treatment of his COPD. R. 870. Plaintiff had scant expiratory wheezes, but an otherwise normal examination including a negative depression screening. R. 871–72.

### 6.   *Poplar Springs Hospital*

Plaintiff was admitted to Poplar Springs Hospital on December 25, 2018, after making suicidal threats to his mother. R. 480. He reported feeling depressed off and on for several years, drinking 6–12 beers per day, and that he had previously been prescribed Prozac, Wellbutrin, and Trazodone, but had not taken his medications recently. *Id.* His mental status examination revealed a depressed mood, constricted affect, and decreased psychomotor activity. R. 481. His physical examination was normal except for "coarse breath sounds," and his gait was stable without ataxia. R. 483–84. Plaintiff was admitted, placed in a detox protocol, restarted on medication, placed in group and individual therapy, and was discharged on December 29, 2018, with prescriptions for

Campral and Prozac.  R. 481, 485–86.  His prognosis was guarded without treatment and good with treatment.  R. 486.

### 7.     *Western Tidewater Community Services Board*

In January 2019, plaintiff was evaluated by Vonda Warren-Lilly, LMHP, at Western Tidewater Community Services Board.  R. 487–503.  LMHP Warren-Lilly noted that plaintiff's primary substance abuse problem was with alcohol, and that he had one occasion of suicidal thoughts in December 2018.  R. 489–90.  Plaintiff reported that he became depressed and anxious every two to three months, and would want to be alone, drink alcohol, and "leave everything else behind."  R. 490.  Plaintiff reported that he was not employed and did not want to work.  R. 488. He explained that he lived with his grandmother and had no transportation to get to work, and that COPD and emphysema prevented full-time work.  R. 488, 496.  On examination, plaintiff had a severely depressed mood with depressive thought content.  R. 499–500.  He was diagnosed with major depressive disorder, recurrent, severe, without psychotic features, and started monthly cognitive behavioral therapy.  R. 500.

In March 2019, plaintiff reported that he had stopped his medications the previous year thinking that he did not need them anymore, and relapsed resulting in his hospitalization.  R. 506. Plaintiff had a depressed and anxious mood, constricted affect, and complained of boredom.  R. 507, 510.  He was directed to continue taking Prozac and to start Wellbutrin.  R. 509.

Plaintiff began seeing Tammy Walters, PA, monthly for medication management, with 11 appointments between March and December 2019.  R. 511–725.  On each of these occasions, PA Walters noted that plaintiff's medication compliance was good and that he had no side effects from taking his medications.  R. 512, 528, 556, 592, 626, 659, 663, 712, 716, 720, 724.  On nine of the visits, plaintiff's mental status examinations were completely normal.  R. 526, 554, 587, 623, 657,

11

661, 713, 717, 725.  On the remaining two occasions, plaintiff's mental status examinations were mostly normal, with these exceptions:  PA Walters noted that plaintiff had slowed, soft speech in September 2019, and noted in October 2019 that plaintiff had a constricted affect and appeared slightly depressed although he denied a depressed mood.  R. 664, 721.  Plaintiff consistently reported that he was avoiding alcohol, his alcohol cravings were under control, and that he was doing well (R. 512, 528, 556, 626, 659, 663, 712, 716), although he sometimes reported that he was bored (R. 592, 663, 721).  In June 2019, plaintiff explained that he was considering working part-time, but that he had applied for disability and needed to care for his grandmother.  R. 592.  In December 2019, plaintiff reported a "good" mood and that he was helping his grandmother cook for the holidays.  R. 712.  PA Walters noted that plaintiff was "much improved" and should be discharged from care with a 90-day supply of his medications (Wellbutrin, naltrexone, and Prozac).  R. 699, 713.

In March 2020, Chelsea Jefferson, LMHP, reported the following in plaintiff's discharge summary:  (1) plaintiff was "doing extremely well"; (2) he no longer met the criteria for any services and had no presenting problems; (3) his previous problems, including substance abuse and depression were in remission as he had not consumed alcohol for over one year and had had no depressive symptoms for several months; (4) his medications were helping; (5) plaintiff was "content not working" and was "helping his 90+ year old grandmother around her home"; and (6) he had a healthy support system consisting of his mother, grandmother, and girlfriend.  R. 690.  Plaintiff described his typical day as waking at 7:00 a.m., having coffee and taking medications, making food, doing yardwork or housework (noting that, other than laundry, he completed all other household chores), cooking dinner daily, and assisting his grandmother with errands.  R. 702.  His mental status examination was normal, and LMHP Jefferson noted only mild functional

limitations.  R. 705, 707.

Plaintiff had one final appointment with PA Walters in March 2020, following his discharge.  R. 686–87.  Plaintiff reported that his mood was "pretty good," he had established care with the community health center, his medication compliance was good with no side effects, and he had not experienced mood swings, irritability, or anxiety.  R. 687.  Plaintiff's mental status examination was normal.  R. 688.

### 8.   *Opinions of State Agency Experts*

In connection with plaintiff's physical residual functional capacity ("RFC"), Bert Spetzler, M.D., a state agency physician, reviewed plaintiff's medical record on December 13, 2019.  R. 95–96.[7]  Dr. Spetzler opined plaintiff:  (a) could lift/carry 20 pounds occasionally and 10 pounds frequently; (b) could sit and stand/walk for 6 hours each in a normal workday; (c) could occasionally balance, stoop, kneel, crawl, crouch, and climb ramps/stairs; (d) could never climb ladders, ropes, scaffolds; (e) had no manipulative, visual, or communicative limitations; (f) should avoid concentrated exposure to extreme heat, humidity, and vibration; and (g) should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  *Id.*  Dr. Spetzler opined that plaintiff "should be capable of light RFC with environmental limitations."  R. 96.  On May 18, 2020, Michael Koch, M.D., a state agency physician, agreed with Dr. Spetzler's conclusions about plaintiff's RFC.  R. 127–29.

Louis Perrott, Ph.D., a psychological state agency consultant, applied the psychiatric review technique on October 4, 2019, and found plaintiff's medically determinable impairments

---

[7] The state agency referred plaintiff for chest radiographs and cardio-pulmonary labs and Dr. Spetzler reviewed the results.  R. 91.  The two chest radiographs taken in November 2019 revealed no active cardiopulmonary disease.  R. 677.  The cardio-pulmonary labs performed in December 2019 revealed $FEV_1$ of 3.12 and FVC of 5.02.  R. 680–83.

for depressive, bipolar and related disorders, and anxiety and obsessive-compulsive disorders did not satisfy the "A" criteria for those listings. R. 92–93. As for the listings' "B" criteria, Dr. Perrott found mild limitations in concentrating, persisting, and keeping pace, and in interacting with others; and no limitations in understanding, applying, and remembering information, or in self-management and adaptation. R. 93. He found no evidence satisfying any "C" criteria, and concluded that plaintiff's mental impairments were non-severe. *Id.*

On May 18, 2020, Nicole Sampson, Ph.D., a state agency psychological consultant, agreed with Dr. Perrott's conclusions about plaintiff's RFC, noting that plaintiff reported in March 2020 that it had been over one year since he consumed alcohol, several months since he experienced depressive symptoms, and his medication was helping. R. 125–26. Dr. Sampson concluded that plaintiff's mental impairments remained non-severe. R. 126.

As for plaintiff's claim for SSDI, Dr. Spetzler and Dr. Perrott found there was insufficient evidence predating the date last insured of December 31, 2018, to fully assess the severity of plaintiff's condition. R. 105–07. Dr. Koch and Dr. Sampson agreed with this determination on reconsideration. R. 114–17.

### 9. *Consultative Examination – Shawne Bryant, M.D.*

On October 19, 2019, Shawne Bryant, M.D., performed a consultative examination of plaintiff at the request of the Social Security Administration ("SSA"). R. 672–75. Plaintiff provided the following history: (1) he was diagnosed with asthma during childhood and used a nebulizer twice weekly and an inhaler daily; (2) he was diagnosed with emphysema and COPD in 2016 with no recent hospitalizations for pulmonary conditions; (3) he was diagnosed with anxiety and depression in December 2018 that he treated with medication and weekly group counseling (both of which were helpful) and he had no history of mental hospitalizations or suicidal ideations;

(4) he could sit without problems, stand and walk for an hour at a time, and lift up to 50 pounds; and (5) he smoked a pack of cigarettes every two days. R. 672–73.

On physical examination, Dr. Bryant noted that plaintiff had decreased breath sounds throughout his lungs, but no rales, wheezes, or rhonchi. R. 673. The rest of the examination resulted in normal findings, including that plaintiff had no shortness of breath, even during range of motion maneuvers, and did not present with an ambulatory device. R. 673–74. Plaintiff had negative straight leg raising tests bilaterally, normal ambulation, walked on his heels and toes and in tandem as well as hopped on one foot bilaterally and squatted to 80%, with full strength in his upper and lower extremities. *Id.* Plaintiff also had a normal mental status examination and did not appear to be anxious. *Id.*

Dr. Bryant concluded that plaintiff could sit without problems during an eight-hour day, stand 3 to 4 hours with normal breaks (only one hour at a time "due to alleged shortness of breath"), walk for 3 to 4 hours with normal breaks (only one hour at a time), frequently lift and carry 25 pounds, occasionally lift and carry 50 pounds, perform manipulative maneuvers frequently, occasionally bend, stoop, and crouch, may experience communication limitations due to a history of anxiety and depression, and did not require an assistive device. R. 674–75.

### 10. *Medical Source Statement—Chelsea Jefferson, MSW*

On February 17, 2020, Chelsea Jefferson, MSW, completed a medical source statement. R. 976. Ms. Jefferson diagnosed major depressive disorder and alcohol use disorder. *Id.* The only symptom checked out of 23 potential symptoms indicated that plaintiff previously had feelings of guilt and worthlessness, but did not currently have these feelings. *Id.* As a result of his mental health, Ms. Jefferson opined that plaintiff would have a mild impairment in his ability to deal with normal work stress and no impairments with respect to the other eight listed categories. *Id.* Lastly,

she estimated that plaintiff would be absent two days per month due to his mental health problems.
*Id.*

## III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[8] the ALJ followed the five-step analysis set forth
in the SSA regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered whether
plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an
impairment that meets or medically equals a condition within the SSA's listing of official
impairments; (4) had an impairment that prevents him from performing any past relevant work
considering his RFC; and (5) had an impairment that prevents him from engaging in any substantial
gainful employment. R. 17–32.

The ALJ found that plaintiff met the insured requirements[9] of the Social Security Act
through December 31, 2018, and had not engaged in substantial gainful activity from January 1,
2016, his alleged onset date of disability. R. 19.

At steps two and three, the ALJ found that plaintiff had the following severe impairments:
COPD with emphysema and asthma. *Id.* The ALJ classified plaintiff's other impairments,
including depression, anxiety, and substance abuse, as non-severe. R. 20. In making this finding,

---

[8] To qualify for SSDI, an individual must meet the insured status requirements of the Social
Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act.
"Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any
substantial gainful activity by reason of any medically determinable physical or mental impairment
which can be expected to result in death or which has lasted or can be expected to last for a
continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a); 416.905(a). To meet
this definition, the claimant must have a "severe impairment" making it impossible to do previous
work or any other substantial gainful activity that exists in the national economy. *Id.*

[9] In order to qualify for SSDI, an individual must also establish a disability that commenced on or
before the last day in which that individual met the insured status requirements of the Social
Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

the ALJ explained that plaintiff had no limitation in his ability to understand, remember, and apply information; and only mild limitations in interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing himself. R. 20–21.

The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 21.

The ALJ next found plaintiff possessed an RFC for light work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), except that he:  (a) must avoid crawling, kneeling, and climbing ladders, ropes, and scaffolds; (b) can occasionally perform other postural movements; (c) cannot do fast-paced tasks, such as assembly-line jobs involving production quotas; (d) can frequently finger, grasp, handle, and reach; (e) has to avoid working around hazards such as dangerous machinery and unprotected heights; and (f) has to avoid even moderate exposure to respiratory irritants and extreme temperatures and humidity.  R. 22–30.

At step four, the ALJ decided, consistent with the VE's testimony, that plaintiff could not return to his past relevant work as a welder/metal fabricator and tree trimmer. R. 30.

Finally, the ALJ proceeded to step five, and found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC based on all impairments, that he could perform other jobs in the national economy, such as a cashier, sales attendant, surveillance system monitor, document preparer, and ticket checker.  R. 31.

Accordingly, the ALJ concluded plaintiff was not disabled from his alleged onset date through the date of the decision and was ineligible for SSDI or SSI. R. 32.

## IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached through an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Thus, reversing the denial of benefits is appropriate only if either (a) the record lacks substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.     ANALYSIS

Plaintiff asserts the ALJ erred in three respects.  First, the ALJ erred by not fully analyzing whether plaintiff's COPD, asthma, emphysema, and bilateral joint impairments meet or equal a listing.  Mem. In Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem."), ECF No. 16, at 18–26.  Second, the ALJ cherry-picked the medical evidence in determining plaintiff's RFC by failing to investigate plaintiff's cervical spine condition resulting from his motor scooter accident, his mental health impairments (especially his substance abuse disorder), and the reality that no employer can guarantee plaintiff a workplace free from respiratory irritants.  *Id.* at 26–30.  Third, the ALJ erred in failing to properly evaluate plaintiff's credibility.  *Id.* at 30–34.

The Commissioner contends substantial evidence supports the ALJ's listing analysis and conclusion that plaintiff's respiratory and knee impairments do not meet or equal a listed impairment.  Def.'s Br. in Supp. of the Comm'r of Soc. Sec.'s Decision Denying Benefits and in Opp. To Pl.'s Mot. For Summ. J. ("Def.'s Br."), ECF No. 18, at 16–19.  The Commissioner further asserts substantial evidence supports the ALJ's RFC determination and determination of plaintiff's credibility.  *Id.* at 19–25.

### A.     *Substantial evidence supports the ALJ's listing analysis.*

The ALJ considered whether plaintiff's combined impairments met or medically equaled a respiratory disorder listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the listings"),[10] and had lasted

---

[10] "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a)).  Because the listings identify individuals unable to perform any gainful activity regardless of their background, the medical criteria defining the listed impairments are intentionally set at a higher level of severity than that required to meet the statutory standard for disability.  *Id.*  Thus, "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary."  *Id.*  In deciding whether a claimant has an impairment or combination thereof that meets or medically equals a listing, the regulations require consideration of the combined effect of all medically

or were expected to last for a period of at least 12 months.   R. 21; *see also* 20 C.F.R.

§§ 404.1525(b)–(d), 416.925(b)–(d).   To meet or medically equal a listing, a claimant's

impairment or combination thereof must satisfy "all of the criteria" of that listing.   20 C.F.R.

§§ 404.1525(d); 416.925(d); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (noting that "[a]n

impairment that manifests only some of those criteria, no matter how severely, does not qualify").

For a claimant to qualify for benefits by showing that his impairments are "equivalent" to a listed

impairment, he must present *medical findings* equal in severity to *all* the criteria for the one most

similar listed impairment.[11]   *Zebley*, 493 U.S. at 531 (citing 20 C.F.R. § 416.926(a) (1989)).   "The

functional consequences of [a combination of] impairments . . . irrespective of their nature or

extent, *cannot* justify a determination of equivalence."   *Id.* (quoting Soc. Sec. Ruling 83-19, at 91–

92).   A plaintiff bears the burden of showing the relevant criteria are met.   20 C.F.R.

§§ 404.1526(a), 416.926(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

    1.     **Respiratory Impairment Listings**

    The relevant respiratory impairment listings are 3.02 (chronic respiratory disorders-COPD,

chronic bronchitis, emphysema) and 3.03 (asthma).   R. 21; *see* 20 C.F.R. §§ 404.1525–26;

416.925–26.   Plaintiff concedes that the ALJ correctly found that plaintiff did not meet the criteria

---

determinable impairments, even those that are not severe.  20 C.F.R. §§ 404.1523(c), 416.923(c).
Part A of the listings defines what evidence is needed to meet or medically equal the listings.  *See*
20 C.F.R. Pt. 404, Subpt. P, App. 1.

[11] If a claimant has an impairment that is described in the listing, but (1) does not exhibit one of
more of the findings specified in the listing, or (2) exhibits all of the required findings, but lacks
the required severity level for each finding, the claimant can show equivalency by proving other
findings related to the impairment that are at least of equal medical significance to the listed
criteria.   20 C.F.R. §§ 404.1526(b)(1), 416.926(b)(1).   If a claimant has a combination of
impairments not described in the listings, the claimant can show equivalency by proving the
findings related to those impairments are at least of equal medical significance to those of a listed
impairment  20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3).

for listing 3.02 because his pulmonary function test results fell outside the parameters necessary to meet the criteria of the listing. Pl.'s Mem. 19 (citing R. 21, 825). Listing 3.02 provides tables that indicate the $FEV_1$ and FVC scores that meet the listing based on a claimant's age, gender, and height. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 3.02 (A), (B). To meet the listing, plaintiff's $FEV_1$ must be less than or equal to 1.90 (plaintiff's was 2.31 and 3.12), and his FVC must be equal to or less than 2.40 (plaintiff's was 3.52 and 5.02). *Id.* § 3.02 (A), (B); *see also* R. 680–83, 825.

Plaintiff further concedes that the ALJ correctly found that he does not meet the criteria for listing 3.03 because he had not been hospitalized for respiratory issues during the relevant period. Pl.'s Mem. 19–20 (citing R. 21). Listing 3.03 requires that, in addition to meeting certain $FEV_1$ criteria, a claimant must have exacerbations or complications requiring three hospitalizations within a 12-month period at least 30 days apart and each lasting at least 48 hours. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 3.03.

Plaintiff argues, however, that the ALJ failed to consider if his respiratory conditions equaled the listing criteria. R. 20. To establish this equivalence, plaintiff relies on: (1) a February 2021 chest x-ray showing hyperinflated lungs with a flattened diaphragm; (2) an August 2021 chest MRI revealing moderate to severe emphysema; (3) medical records reflecting treatment for coughing, wheezing, and shortness of breath; (4) prescriptions for prednisone, Keflex, Spiriva, Symbicort, albuterol, and inhalers; and (5) plaintiff's testimony about breathing difficulty. Pl.'s Mem. 21. Plaintiff argues that the ALJ's failure to conduct the proper analysis and explain why this evidence does not equal listed impairments 3.02 and 3.03 prevents the Court from undertaking a meaningful review. *Id.* at 21–22.

SSR 17-2p provides that, to support a finding of medical equivalence at step three, the record must contain:

1. A prior administrative medical finding from a[ ] [medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3. A report from the [Appeals Council's] medical support staff supporting the medical equivalence finding.

2017 WL 3928306, at *3 (S.S.A. Mar. 27, 2017); *see Doretha B. v. Kijakazi*, No. CV MJM-20-2962, 2022 WL 1052680, at *2–3 (D. Md. Apr. 5, 2022) (concluding that the claimant's argument was insufficient to demonstrate medical equivalence where she did not identify any evidence from specific medical experts regarding equivalency as required under SSR 17-2p); *Sherrod v. Kijakazi*, No. 4:21-CV-49-RJ, 2022 WL 4130766, at *4 (E.D.N.C. Sept. 12, 2022) (same). The state agency physicians who reviewed plaintiff's medical records found plaintiff's respiratory impairments did not meet or equal a listed impairment. R. 93–94, 126. Further, plaintiff's pulmonologist found that plaintiff's COPD was mild and "nowhere near disability." R. 825.

In determining that plaintiff's impairments do not meet or medically equal in severity the criteria of listing 3.02 or 3.03, the ALJ cited plaintiff's pulmonary function test results, and that plaintiff had no hospitalizations or emergency department visits related to breathing difficulties. R. 21. At step 4, the ALJ thoroughly discussed plaintiff's medical records, including each of the categories of evidence outlined by plaintiff in support of his equivalence argument, as well as the opinions of the state agency physicians and plaintiff's pulmonologist. R. 21–25; *see Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011) (holding the ALJ's decision as a whole provided substantial evidence to support the finding at step three that plaintiff's impairments did not meet a listing). Substantial evidence supports the ALJ's finding that plaintiff's combined impairments do not meet or equal the criteria of listings 3.02 for chronic respiratory disorders or 3.03 for asthma.

### 2.   Joint Impairments Listing

Next, plaintiff asserts the ALJ erred by not evaluating plaintiff's impairments under listing 1.18 (abnormality of a major joint any extremity).   Pl.'s Mem. 22–26.   Plaintiff contends that his "credible testimony and his well-documented disabling joint condition" meet, and are equal to, the criteria of listing 1.18.   *Id.* at 26.   Plaintiff references ongoing issues with his right knee, including decreased range of motion and mild osteoarthritis.   *Id.* at 23.   Plaintiff also notes that his joint condition affects his upper extremities "with at least one flare causing pain, stiffness, limited range of motion, and edema in his left elbow."   *Id.* at 24.

Medical findings, and not plaintiff's testimony about his functional limitations, must establish that plaintiff's impairments meet the criteria of listing 1.18.   *See Zebley*, 493 U.S. at 531. One of the several criteria a claimant must establish to meet listing 1.18 is:   (1) a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; (2) an inability to use one upper extremity, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or (3) an inability to use both upper extremities to the extent that neither can be used for fine and gross movements.   20 C.F.R. Pt. 404, Subpart P, App'x 1, § 1.18(D).

The ALJ considered plaintiff's knee and elbow impairments and found them to be non-severe at step two.[12]   R. 20.   The ALJ continued to the next steps, and thoroughly considered plaintiff's knee and elbow impairments and resulting symptoms in determining plaintiff's RFC at

---

[12] The second step in assessing disability requires consideration of whether the claimant suffers from a medically determinable impairment that is severe.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   Under the regulations, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. §§ 404.1522(a), 416.922(a).

step four. R. 23–25. The ALJ noted plaintiff's treatment for knee pain between August 2020 and July 2021, negative labs results for rheumatoid arthritis and gout, x-rays showing no significant arthritic change, an MRI showing tendinosis and effusion, and treatment with aspiration and steroid injections. R. 23–25, 28. The ALJ noted that, in July 2021, plaintiff had no crepitation, effusion, or tenderness, had a full range of motion and normal gait, and was advised to resume activities as tolerated without restrictions. R. 25. The ALJ considered plaintiff's testimony that, although it was not prescribed by a doctor, he needed a cane to walk. R. 23. The ALJ also noted that, throughout plaintiff's medical record, he was found to have a normal gait and did not require an assistive device. R. 24–25, 27, 29. Further, although plaintiff sought treatment for elbow pain, edema, and tenderness once, there are no records of ongoing treatment for his elbow. R. 24, 737–39.

The ALJ did not err in finding plaintiff's joint impairments were non-severe and thus did not err in failing to address whether these impairments met or equaled listing 1.18. Contrary to plaintiff's argument, the fact that plaintiff does not have a documented medical need for an assistive device to ambulate precludes plaintiff from meeting the parameters of listing 1.18.

**B.**    ***Substantial evidence supports the ALJ's RFC determination.***

Plaintiff next asserts that the ALJ cherry-picked the evidence to support the decision reached with respect to his RFC while ignoring facts that support a disability finding. Pl.'s Mem. 26–29. Specifically, plaintiff asserts the ALJ failed to investigate the cervical spine condition caused by plaintiff's motor scooter accident and later narcotics use, investigate plaintiff's mental health impairments including his substance abuse disorder, and appropriately consider the vocational expert's testimony on the difficulty of finding a workplace free from respiratory irritants. *Id.*

1.      **Cervical spine injuries and use of narcotics following motor scooter accident.**

Plaintiff faults the ALJ for the "dismissive consideration" of the injuries resulting from his motor scooter accident, including cervical spine injuries evidenced by an MRI and use of narcotics. *Id.* at 27–28.   Specifically, plaintiff asserts the ALJ "failed to adequately investigate or analyze the impact of [plaintiff's] injuries from his accident on his current level of functioning, and he disregarded [plaintiff's] narcotics treatment and management in analyzing [plaintiff's] physical and mental health conditions." *Id.* at 28.

The determination of the RFC "is an agency-conducted administrative assessment that considers all relevant" medical and other evidence. *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (citing 20 C.F.R. § 416.945(a)(3)); *see also* 20 C.F.R. §§ 404.1545(a), 404.1546(c), 416.945(a)(3), 416.946(c)).[13]   The agency's responsibility is to "develop [a claimant's] complete medical history," upon which a determination about disability may be made.   20 C.F.R. §§ 404.1512(a)(2), (b)(1), 416.912(a)(2), (b)(1).   In some cases, the record is "insufficient"—that is, lacking the information needed to assess disability, or "inconsistent"—that is, "conflict[ing]," "ambiguous," or not "based on medically acceptable clinical or laboratory diagnostic techniques."   20 C.F.R. §§ 404.1520b(b), 416.920b(b). Depending on the issues in any case, the agency "may" seek additional evidence, for example, by recontacting medical sources, seeking more information, or by ordering a consultative examination ("CE").   20 C.F.R. §§ 404.1520b(b), (b)(2)(i)–(iv), 416.920b(b), (b)(2)(i)–(iv); *see also* 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (describing when a CE may be sought).

---

[13] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c).

The regulations, however, only require an ALJ "to seek additional evidence or clarification if the ALJ cannot reach a conclusion about whether the claimant is disabled based upon the evidence in the case record." *Harper v. Saul*, No. 4:19-CV-01535-CMC, 2020 WL 6074164, at *8 (D.S.C. Oct. 15, 2020).  To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence" to make a disability determination. *Loving v. Astrue*, No. 3:11cv411, 2012 WL 4329283, at *5 (E.D. Va. Sept. 20, 2012) (citation and quotation omitted).

Here, the record contained sufficient evidence to enable the ALJ to assess disability and no need existed to seek more information regarding impairments resulting from the accident.   In August 2021, plaintiff hit a rock while driving his motor scooter causing an accident that resulted in the motor scooter partially landing on plaintiff.  R. 24, 908.  Plaintiff suffered three fractured ribs and damage to his spleen that required an emergency splenectomy.  R. 24, 901–02, 915, 919–20.  Plaintiff was prescribed narcotic medication followed by methadone treatment to prevent addiction.  R. 24, 886–87.  As part of his treatment following this accident, plaintiff was given a cervical spine CT (not an MRI as labeled by plaintiff) with these findings:

> VERTEBRAE AND DISCS:  Vertebral alignment and articulation are within normal limits.  Vertebral body heights are maintained.  There is moderate to significant disc space narrowing at C6–C7.   Specifically, no compression deformities are noted and there is no spondylolisthesis.  No displaced fractures are identified.  There are no significant areas of bone lucency or sclerosis.
>
> SPINAL CANAL AND FORAMINA: C3–C4 demonstrates lateral disc osteophyte complex moderately narrowing the right neural foramen.  C5–C6 and C6–C7 demonstrate lateral disc osteophyte complex mildly narrowing the left neural foramen.

R. 833–34.  In the impression section, the radiologist summarized the findings by stating, "[n]o acute fractures or listhesis.  Spondylosis as described." R. 834.  The cervical spine CT noting degenerative changes does not reflect a spine or neck injury resulting from the accident and the

hospital records do not reflect any treatment for neck or back injuries.

The ALJ considered plaintiff's accident, resulting injuries, and treatment. R. 23–24. When asked generally about his accident, plaintiff testified about his fractured ribs, ruptured spleen, the necessity for narcotic medications, and methadone treatment, but did not include neck or back injuries. R. 23, 51. When plaintiff's counsel specifically asked whether plaintiff had any neck pain as a result of the accident, plaintiff responded, "I do know I have a vertebrae that is compressed and it does affect my neck and back, but I don't really have any medical – you know, I haven't really seen anybody for that particular issue." R. 23, 52.

The ALJ considered plaintiff's compromised immune system resulting from the splenectomy, plaintiff's ongoing methadone treatment, and plaintiff's testimony that he had a compressed vertebrae. R. 23. The ALJ noted that, in his follow-up appointment following his release from the hospital, plaintiff had a normal gait, full range of motion, and intact cranial nerves. R. 24. The ALJ further summarized treatment records from November 2021, December 2021, and January 2022, during which plaintiff neither complained of, nor received treatment for, back or neck injuries. R. 24–25; *see* R. 871–73 (January 2022—tinnitus, and an intermittent cough), 876–78 (December 2021—follow-up for smoking cessation with no other complaints), 886–89 (November 2021—annual physical).

Nor does the record reflect any complications related to plaintiff's use of narcotics following his accident or his methadone maintenance. R. 870–71, 876–77, 886–87. Plaintiff testified that the methadone helped control his knee pain and the chest pain he experienced due to emphysema, and did not cause any side effects. R. 53.

Nothing in plaintiff's record suggests that he suffered disabling neck or back injuries as a result of his motor scooter accident, or that he has disabling impairments because of the use of

narcotics or methadone maintenance, and the ALJ had no obligation to develop the record with respect to injuries and treatment resulting from the August 2021 accident.

### 2.     Mental health impairments including substance abuse disorder.

Plaintiff asserts that he "uses alcohol to cope with the symptoms of his mental illness, namely depression," and that his "abuse of alcohol is inseparable from his major depressive disorder." Pl.'s Mem. 29. Plaintiff explains that he was drinking up to 12 beers per day prior to his psychiatric hospitalization in 2018 for suicidal thoughts, and he suffered a relapse in August 2021 resulting in the motor scooter accident. *Id.* Plaintiff argues the ALJ erred by failing to perform "further investigation or analysis of [his] mental impairments following the accident." *Id.*

At step two, the ALJ determined that plaintiff's depression, anxiety, and substance abuse caused no more than mild functional limitations. R. 20–21. The ALJ relied on plaintiff's testimony, function reports, mental health treatment notes, and findings of the consultative examiner. *Id.*

In developing plaintiff's RFC, the ALJ also considered plaintiff's mental impairments. The ALJ considered plaintiff's ongoing treatment for depression, including his inpatient treatment in December 2018 after "making suicidal statements and drinking heavily," as well as his accident in August 2021 following alcohol use. R. 23–25. The ALJ considered plaintiff's progress with mental health treatment with multiple normal mental status examinations. R. 25–27, 29. The ALJ tracked plaintiff's successful completion of, and discharge from, mental health and substance abuse treatment, with notations that his depressive disorder and alcohol dependence were in remission. R. 26–27, 29. The ALJ noted that, following his August 2021 accident, plaintiff's depression screenings were negative in November and December 2021. R. 24–25. The ALJ also discussed plaintiff's consistent representations that he was independent in his activities of daily

28

living.  R. 29.

In light of the negative depression screenings and lack of any mental health treatment following the accident, there was no requirement that the ALJ further develop the record with respect to plaintiff's mental health following the 2021 accident.

### 3.    VE testimony regarding a workplace free from respiratory irritants.

Next, plaintiff asserts the ALJ disregarded the testimony of the VE that "unexpected respiratory irritants such as perfumes and cleaning supplies are 'a possibility' in every workplace," and respiratory irritants "increase his constant difficulty breathing."  Pl.'s Mem. 29–30.

The ALJ considered that plaintiff had been treated on "multiple occasions" for COPD, but had not been hospitalized or visited the emergency department for respiratory issues.  R. 28.  The ALJ considered plaintiff's treatment of his COPD with inhalers, nebulizer treatments, and medications (R. 23–25); 2019 x-rays showing no cardiopulmonary disease (R. 23); 2021 CT scan showing moderate to severe emphysema (R. 24); 2021 finding by plaintiff's pulmonologist that he had "mild COPD," "nowhere near disabled level" (R. 24); the consultative examiner's finding that plaintiff had "no evidence of shortness of breath or fatigue with range of motion maneuvers" (R. 27); and plaintiff's persistence in smoking daily despite the advice of his doctors (R. 23–28).

Based on these considerations, the ALJ found plaintiff must "avoid even moderate exposure to respiratory irritants and extreme temperatures and humidity."  R. 22.  The VE considered this limitation when testifying about jobs that existed in the national economy that a person with plaintiff's limitations could perform.  R. 31, 56–59.  The ALJ did not find plaintiff was limited to no exposure to irritants, as plaintiff has suggested.  Accordingly, the ALJ did not err in considering the VE's testimony on respiratory irritants in the workplace.  R. 31, 58.

29

**C.      *The ALJ did not err in assessing plaintiff's credibility*.**

Lastly, plaintiff asserts the ALJ erred by not crediting his "consistent complaints about his difficulty ambulating and breathing to support a disability finding," and ignored plaintiff's "testimony regarding the *combined impact* of his physical and mental conditions." Pl.'s Mem. 32–34. In assessing such complaints, an ALJ must engage in the two-step inquiry detailed in 20 C.F.R. §§ 404.1529 and 416.929 by evaluating:   (1) whether an underlying medically determinable impairment was established by objective medical evidence that could reasonably be expected to produce a claimant's symptoms, and (2) if so, the extent to which such symptoms limited a claimant's functioning and ability to work, based on their intensity, persistence, and limiting effects. *See Lewis v. Barnhill*, 858 F.3d 858, 865–66 (4th Cir. 2017); *Craig*, 76 F.3d at 593–95. At the second step, an ALJ must "assess the credibility of the claimant's statements about symptoms and their functional effects."   *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)).   To evaluate the intensity and persistence of a claimant's symptoms, the ALJ must consider all the evidence, including the objective medical evidence, the claimant's daily activities, various facets of any asserted pain (including its intensity, location, and frequency), any events giving rise to symptoms, medical treatments, and medications and their effectiveness, any other pain relief measures, and other factors about the claimant's functional limitations and restrictions because of pain. 20 C.F.R. §§ 404.1529(c), 416.929(c).  In conducting this inquiry, an ALJ cannot discount a claimant's subjective evidence of pain intensity based solely on objective medical findings. *Lewis*, 858 F.3d at 866 (citations omitted).

The ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements related to the intensity, persistence, and limiting effects of his symptoms "are not entirely consistent with the medical

evidence and other evidence in the record." R. 23.  The ALJ also found plaintiff's allegation of disabling impairments "are inconsistent with objective findings and subjective findings on examinations as well as his activities of daily living." R. 27.

As for difficulty ambulating, the ALJ noted that plaintiff brought a cane to the hearing and testified that he used a cane anytime he left the house, but that the cane was not prescribed by a doctor.  R. 23.  The ALJ also noted that plaintiff did not present to his consultative examination with an assistive device, and his ambulation, range of motion, and strength were all normal.  R. 27.  The consultative examiner specifically found plaintiff did not require an assistive device.  R. 674–75.  The ALJ considered that, throughout plaintiff's medical record, plaintiff routinely had a normal gait and normal strength.  R. 24–25, 27; *see also* R. 483–84, 741, 743, 902–03, 933, 940.  The ALJ considered that, during his annual physical examination in November 2021, plaintiff had no weakness in his extremities, a full range of motion, and a normal gait.  R. 24, 887–88.  Accordingly, the ALJ did not err in assessing plaintiff's testimony about difficulty ambulating.

The ALJ also considered plaintiff's testimony regarding his difficulty breathing.  R. 23.  The ALJ thoroughly considered plaintiff's treatment for his respiratory impairments, including that plaintiff had been treated on "multiple occasions" for COPD, but had not been hospitalized or visited the emergency department for respiratory issues (R. 28); plaintiff's treatment of his COPD with inhalers, nebulizer treatments, and medications (R. 23–25); 2019 x-rays showing no cardiopulmonary disease (R. 23); 2021 CT scan showing moderate to severe emphysema (R. 24); the consultative examiner's finding that plaintiff had "no evidence of shortness of breath or fatigue with range of motion maneuvers" (R. 27); plaintiff's persistence in smoking daily despite the advice of his doctors (R. 23–28); and 2021 finding by plaintiff's pulmonologist that he had "mild COPD," "nowhere near disabled level" (R. 24).  Based on these medical records, along with

plaintiff's testimony about difficulty breathing, the ALJ found plaintiff's RFC required that he avoid even moderate exposure to respiratory irritants and extreme temperatures and humidity. R. 22. Thus, the ALJ did not err in assessing plaintiff's testimony on breathing difficulties.

Lastly, the ALJ considered the combined effect of plaintiff's physical and mental impairments. Along with plaintiff's respiratory impairments and mobility issues discussed above, the ALJ referenced mental health records indicating improvement and stability in mood and affect with medication; discharge from mental health treatment because of improvement; subsequent negative depression screenings, and plaintiff's activities of daily living, including caring for his elderly grandmother. R. 27–28. All experts opining on plaintiff's functional limitations resulting from his mental health impairments found only mild limitations. R. 93, 125–26 (state agency psychological consultants), 673–74 (consultative examiner), 976 (Chelsea Jefferson, MSW). The ALJ considered the consultative examiner's findings that plaintiff's depression and anxiety were treated with medication, he was alert and oriented during his examination with good cognition, and he did not appear anxious and followed simple instructions. R. 27. The ALJ further found the psychological consultants' opinions that plaintiff had only mild limitations in part B functioning to be supported by the record. R. 29; *see also* R. 976 (medical source statement of Chelsea Jefferson, MSW, finding no impairment in 8 of 9 categories and mild impairment in his ability to deal with normal work stress). The ALJ adequately addressed plaintiff's non-severe mental health impairments in connection with his physical impairments in determining plaintiff's RFC for a limited range of light work, and did not err in assessing plaintiff's statements regarding the combined effect of his impairments.

## VI.  **RECOMMENDATION**

For these reasons, the Court recommends that plaintiff's motion for summary judgment, ECF No. 15, be **DENIED**, and the decision of the Commissioner be **AFFIRMED**.

## VII.  **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.       Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.       A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 11, 2024

33